*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

CARA CHRISTINE BOWDEN,

Defendant-Appellant.

FOR PUBLICATION
November 10, 2022
9:25 a.m.

No. 357976
Ottawa Circuit Court
LC No. 21-044535-AR

Before: BORRELLO, P.J., and M. J. KELLY and REDFORD, JJ.

BORRELLO, P.J.

In this prosecution for operating while intoxicated (OWI), MCL 257.625(1)(a), defendant Cara Christine Bowden appeals by interlocutory leave granted[1] the circuit court's order affirming the district court's order qualifying Ottawa County Sheriff's Department deputy Adam Schaller as an expert drug recognition evaluator (DRE)[2] and holding that Schaller could provide an opinion whether defendant operated her vehicle under the influence of marijuana to a degree that rendered her unsafe to drive. For the reasons set forth in this opinion, we reverse and remand.

## I. BACKGROUND

On December 1, 2020, defendant was stopped by Ottawa County Sheriff's Department deputy Monte White for driving with only one working headlight. White was working with Schaller at the time of the traffic stop. According to his testimony, Schaller was certified in Advanced Roadside Impaired Driving Enforcement (ARIDE). White testified at the evidentiary

---

[1] *People v Bowden*, unpublished order of the Court of Appeals, entered September 9, 2021 (Docket No. 357976).

[2] The record contains indications both that DRE stands for "Drug Recognition Evaluator" and "Drug Recognition Expert." We need not resolve this discrepancy on the proper nomenclator. Instead, we will simply use the abbreviation "DRE" for the sake of simplicity. Furthermore, even if Schaller's certification designates him to be a drug recognition "expert," that label has no bearing on whether he may properly testify as an expert for purposes of MRE 702.

-1-

hearing that when he approached defendant, he smelled "an odor of marijuana coming from the driver window and . . . noticed that [defendant's] eyes were bloodshot-red." White asked defendant to get out of the vehicle, and White proceeded to administer standardized field sobriety tests (SFSTs). Another Ottawa County Sheriff's Deputy, Brian Williams, arrived on the scene. After Williams' arrival at the scene of the stop, Williams administered two additional tests. When questioned, defendant stated that she smoked marijuana approximately 30 minutes earlier. Schaller observed as defendant completed the tests administered by White and Williams. White testified that he did not observe defendant commit any lane, speed, or other moving violations while she was driving before he initiated the traffic stop. According to Schaller, defendant was asked to rate her "personal feelings of impairment" on a scale of 1 to 10, with "1 being not at all-impaired and 10 being the most high (sic) that somebody could ever be." Schaller testified, "she personally self-rated herself as feeling at a 3, in terms of a scale of 1 to 10." Defendant was arrested and taken to a hospital to have her blood drawn. At the hospital, Schaller administered a DRE evaluation to defendant. Defendant was charged with operating while intoxicated.

As relevant to the issue presented on appeal, the prosecution filed a motion in the district court requesting the court to "declare Deputy Adam Schaller an expert in the field of Drug Evaluation and Classification and be allowed to testify, and provide an expert opinion, as a Drug Recognition Expert." Defendant opposed this motion.

At the evidentiary hearing, Schaller testified that in addition to SFST and ARIDE training, he had completed a DRE training and certification program in 2019. Schaller explained that the DRE program was a "months' long process" that consisted of "80-plus hours of classroom work where you're instructed in different medical conditions, observable signs of drug impairment, different types of drugs, [and] biological factors," followed by field work performing the tests and a final examination. Schaller testified that based on his application of the DRE protocols to defendant and the "totality of the circumstances," he opined that defendant was impaired by, or under the influence of, marijuana and unable to safely drive a motor vehicle at the time of the traffic stop.

In his testimony, Schaller described the DRE protocol in detail. There are 12 steps: a preliminary breath test, an interview with the arresting officer, a preliminary examination and first pulse check, an eye examination, multiple divided attention tests, a vital signs and second pulse check, an examination of pupil sizes in various lighting conditions, an examination of muscle tone, a check for injection sights and third pulse check, an interrogation, the DRE officer's formation of an opinion based on the totality of the facts gathered in the previous 10 steps, and the completion of a laboratory toxicology report. There are 7 drug categories identified by the protocol: central nervous system depressants, central nervous stimulants, hallucinogens, dissociative anesthetics, narcotic analgesics, inhalants, and cannabis.

Schaller also explained the reasons for completing each of the 12 steps. The preliminary breath test is conducted to determine whether the person is under the influence of alcohol. An interview of the arresting officer provides facts and observations about the subject from the scene in instances where Schaller, as the DRE investigator, was not present for the traffic stop and arrest. The preliminary interview involves asking the subject about medical conditions, physical conditions, and medications that may make the subject appear "impaired when they're not." During this step, the DRE investigator also makes observations of any visible signs of impairment

and checks the subject's pulse for the first time. The eye examination includes checking for horizontal and vertical gaze nystagmus and the eyes' ability to converge on an object approaching the face. Next, the subject is administered a series of four tests intended to measure the subject's abilities to divide attention, complete multiple tasks, follow directions, accurately perceive time, and maintain physical body control and balance. Schaller explained that these divided attention tests were relevant to a subject's driving ability because driving a vehicle requires a driver to divide attention, multi-task, and accurately perceive time and distance to share the road with other vehicles. Further, Schaller testified that the various physical examinations were completed because different substances had different physical effects on the body that could be observed during these examinations.

Schaller admitted that the 2018 SFST manual published by NHTSA[3] indicated that the SFSTs, which were also administered as part of the DRE protocol,[4] had only been validated for indicating impairment by alcohol or a person's blood alcohol content. Schaller did not know of any scientific studies validating the use of the SFSTs for determining a person's level of impairment by any other substance.

According to Schaller, the DRE protocol was developed by the Los Angeles Police Department in the late 1970s. Schaller further testified about studies that were conducted regarding the protocol:

> So, in 1984, John Hopkins University with [the] National Highway Traffic Safety Administration [NHTSA] performed a lab validation study where they had volunteers who were dosed with different categories of drugs at different levels who were evaluated by DRE's from the Los Angeles Police Department and through that process they were able to determine, like, a success and error rate and showing that they had a high success rate. And then after that, in 1985, they did a field validation study with the Los Angeles Police Department where 173 individuals who were arrested for impaired driving offenses other than alcohol where blood was collected were evaluated by Drug Recognition Experts, and that was also able to determine an error rate and a positivity rate where they were able to determine the program -- the program validity.

Schaller further explained, however, that the studies found the DRE protocol to be successful in determining that a person was "not impaired" but that "in determining that somebody is impaired and to which drug category that they're impaired, they were able to -- the error rate would be what they were not able to opine." Schaller stated that the goal of the first study "was to determine whether or not the protocol was a valid method of determining whether people were under the influence . . . of certain drug categories." The study did not test actual driving ability. According to Schaller, the "key finding" of the 1985 field study "was that the DBCP, Drug Evaluation Classification Program, or DRE process or program is a reliable tool for law

---

[3] The referenced portions of this manual were admitted into evidence.

[4] According to Schaller, the SFSTs are incorporated within the divided attention tests of the DRE protocol.

enforcement to investigate and determine impairment." Schaller also admitted that a substance like marijuana could be present in person's body without rendering that person "impaired" or "under the influence." Schaller testified:

> So, the goal of this program is not to correlate the presence of a substance to impairment; it's to observe the subject, their demeanor, their physical signs of general indicators of impairment and their performance in a psychophysical test to determine whether or not they are impaired. We use that information that we see to help us determine which type of drug they're -- of the seven categories that they're impaired by. The -- whether or not there's a drug active in their system is -- is only used to confirm -- a confirmatory lab to show that our observations of the person were -- were valid or correct.

The studies referenced by Schaller were admitted into evidence. The conclusion section of the report for the earlier laboratory study states that "[t]his laboratory simulation study does not represent a direct test of the validity of these or related behavioral examination procedures for detecting and identifying drug intoxication in field situations." This study found that the protocol was highly accurate in correctly identifying the class of drug that a subject had taken when the evaluator judged the subject to be intoxicated. The study also found that the likelihood that a subject who had been given an active drug would be judged intoxicated by a DRE evaluator depended on the dose of the drug received and that "[j]udgments of drug intoxication were more likely at the higher doses of active drug than at the lower doses."

In the subsequent field study, the report concluded that "DREs were fairly accurate in determining which drug or drug class the suspect had taken." However, the following quotation from the report succinctly illustrates the limitations of this study as relevant to the issues currently before this Court on appeal:

> This section discusses the accuracy of the DREs decisions regarding which specific drugs the suspects were under the influence of. It is important to remember that the DREs in this study were examining the suspects for law enforcement purposes. The DREs indicated whether they felt the suspects were "impaired" by drugs (and hence "unable to operate a motor vehicle safely"), and if so, what specific drugs (or drug classes) the suspect was "impaired" by.
>
> There is no way to determine objectively whether the suspects were actually too "impaired" to drive safely. The fact that drugs were found in a suspect's blood does not necessarily mean the suspect was too impaired to drive safely. Contrary to the case with alcohol, we do not know what quantity of a drug in blood implies impairment. Thus, this study can only determine whether a drug was present or absent from a suspect's blood when the DRE said the suspect was impaired by that drug. (emphasis added).

Furthermore, the report also stated:

> This field evaluation of the LAPD drug recognition procedure was designed to determine whether trained officers could accurately judge the presence of drugs

other than alcohol in impaired driving suspects, and whether the screening procedure allowed the officers to differentiate between different drugs (or drug classes).

* * *

The results of the two studies conducted by NHTSA appear to show that the LAPD drug recognition procedure provides the trained police officer with the ability to accurately recognize the symptoms of many types of drug use by drivers. When the officers identify a suspect as having used particular drugs a blood test almost always will confirm their judgement.

A 2017 report from the NHTSA to Congress, titled *Marijuana-Impaired Driving - A Report to Congress*, was also admitted into evidence at the hearing. This report began by comparing what is known about marijuana-impaired driving with what is known about alcohol-impaired driving because "the effects of alcohol on driving performance and crash risk are relatively well understood." Noting the intense interest and wealth of research studies devoted to alcohol-impaired driving over a more than 60-year period, the report explained how alcohol is absorbed and eliminated by the body and summarized the well-established correlation between alcohol concentration in the blood or breath and the degree to which driving skills become impaired. The research establishing this correlation involved "studies of alcohol-impaired driving related skills, primarily through laboratory studies involving subjects dosed on alcohol, using psychomotor tasks (reaction time, tracking, target detection), driving simulators and drivers on closed courses in instrumented vehicles, epidemiological studies including roadside surveys of alcohol use by drivers, and studies of alcohol use by crash-involved drivers."

In contrast, the report explains, marijuana is processed by the body in significantly different ways and the effects of marijuana use on driving-related skills have yet to be extensively studied. According to the report, there was research that had "demonstrated the potential of marijuana to impair driving related skills," but the research did not show a relationship between impairment and levels of delta-9-tetrahydrocannabinal (THC).[5] Studies examining the relationship between THC blood levels and degree of impairment had consistently found that "the level of THC in the blood and the degree of impairment do not appear to be closely related" and that "[p]eak impairment does not occur when THC concentration in the blood is at or near peak levels." Further, "[p]eak THC level can occur when low impairment is measured, and high impairment can be measured when THC level is low." The report also indicated that "[c]urrent knowledge about the effects of marijuana on driving is insufficient to allow specification of a simple measure of driving impairment outside of controlled conditions" and that "there are currently no evidence-based methods to detect marijuana-impaired driving." The report's general conclusion as relevant to the issues currently before us is aptly summarized in the following quotation:

> Currently, there is no impairment standard for drivers under the influence of marijuana. Many of the reasons for this are discussed elsewhere in this report. They include the fact that there is no chemical test for marijuana impairment, like

---

[5] THC is the primary psychoactive substance in marijuana.

a BAC or BrAC test for alcohol that quantifies the amount of alcohol in their body, indicates the degree of impairment, and the risk of crash involvement that results from the use of alcohol. The psychoactive ingredient in marijuana, delta-9-tetrahydrocannabinal (THC), does not corelate well with impairment. . . .

Without a chemical test, the alternative is to develop a psychomotor, behavioral or cognitive test that would indicate the degree of driving impairment and elevated risk of crash involvement due to marijuana use. As was described earlier in this report, marijuana has been show [sic] to impair critical driving related skills including psychomotor abilities like reaction time, tracking ability, and target detection, cognitive skills like judgment, anticipation, and divided attention, and executive functions like route planning and risk taking. However, available research does not support the development of such a psychomotor, behavioral or cognitive test that would be practical and feasible for law enforcement use at this time. It is certainly possible that when more research has been conducted on the impairing effects of marijuana use on driving, that can be shown to increase the risk of crash involvement, that it may be possible to develop such a test in the future.

NHTSA, and others, are currently conducting research toward that goal. We are funding a controlled dosing study of different ways to measure marijuana impairment in driving related skills in the hope that some of these measures will be amenable to use by law enforcement. The first step is to show that everyone dosed on marijuana shows an observable amount of impairment in a controlled laboratory setting. The next step would be to develop simplified versions of these measures that do not require sophisticated and expensive equipment that are suitable for field use by law enforcement. The last step would be to establish the relationship between the observed impairment on these tests and elevated risk of crash involvement. Success in the near term is not guaranteed, but possible.

The district court concluded that Deputy Schaller could testify as "a DRE expert." Specifically, the district court found that based on the two studies of the DRE program from the 1980s, the DRE program was "sufficiently reliable to meet the requirements of MRE 702." The district court further stated in relevant part:

The court finds Deputy Schaller has been trained in accordance with the national standards and he performed the DRE protocol proficiently. He may testify as to his observations of a defendant's acts, conduct, and appearance, and to give an opinion on the defendant's state of impairment based on those observations. He may express an opinion that a suspect's behavior and physical attributes are or are not consistent with the behavioral and physical signs associated with certain categories of drugs.

Defendant was granted leave to appeal to the circuit court, and the circuit court affirmed the district court's order. The circuit court concluded that Schaller's testimony regarding the DRE protocol satisfied the relevance and reliability requirements of MRE 702 based on the evidence submitted at the hearing in the district court and based on the acceptance of the DRE program by courts in other jurisdictions.

This Court subsequently granted defendant leave to appeal the circuit court's order.

## II. STANDARD OF REVIEW

An appellate court reviews a lower court's decision to admit or exclude expert testimony for an abuse of discretion. *People v Dobek*, 274 Mich App 58, 93; 732 NW2d 546 (2007). An abuse of discretion occurs when the court's decision falls outside the range of reasonable and principled outcomes. *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008). We review de novo preliminary questions of law, such as whether a rule of evidence precludes the admission of particular evidence and any issues involving interpretation of the Michigan Rules of Evidence. *People v Muhammad*, 326 Mich App 40, 47; 931 NW2d 20 (2018); *Dobek*, 274 Mich App at 93. "A trial court necessarily abuses its discretion when the court permits the introduction of evidence that is inadmissible as a matter of law." *Dobek*, 274 Mich App at 93.

## III. ANALYSIS

Defendant maintains on appeal that the proposed expert testimony of Schaller regarding his application of the DRE protocol and the opinion he formed of defendant's state of impairment due to marijuana is inadmissible under MRE 702.

MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

MRE 702 imposes an obligation on the trial court to ensure that any expert testimony that is admitted at trial is reliable. *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 780; 685 NW2d 391 (2004). Although the exercise of this gatekeeper role is within a trial court's discretion, the court may neither abandon this role nor perform it inadequately. *Id.* Under MRE 702, the trial court is required to "ensure that each aspect of an expert witness's proffered testimony—including the data underlying the expert's theories and the methodology by which the expert draws conclusions from that data—is reliable." *Id.* at 779.

"MRE 702 incorporates the standards of reliability that the United States Supreme Court established in *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993), in interpreting the equivalent federal rule of evidence." *Muhammad*, 326 Mich App at 51-52.

> Under *Daubert*, a trial court must "determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 US at 592. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology

properly can be applied to the facts in issue." *Id*. at 592-593. Some factors that bear on the trial court's inquiry include: (1) whether the scientific knowledge or technique can, and has been, tested, (2) "whether the theory or technique has been subjected to peer review and publication," (3) "the known or potential rate of error," (4) "the existence and maintenance of standards controlling the technique's operation," and (5) whether there is "general acceptance" of the scientific technique. *Id*. at 593-594. However, these factors are not exclusive; instead, "[m]any factors will bear on the inquiry . . . ." *Id*. at 593. [*Muhammad*, 326 Mich App at 52 (ellipses in original).]

This inquiry is a "flexible" one that must focus "solely on principles and methodology" employed, "not on the conclusions that they generate." *Daubert*, 509 US at 594-595. Under MRE 702 and *Daubert*, "the trial court's role as a gatekeeper does not require it to search for absolute truth, to admit only uncontested evidence, or to resolve genuine scientific disputes." *Unger*, 278 Mich App at 217 (quotation marks and citation omitted). Rather, the trial court's role is to filter out evidence that is unreliable, with the relevant inquiry being "whether the opinion is rationally derived from a sound foundation." *Id.* (quotation marks and citation omitted). "*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co, Ltd v Carmichael*, 526 US 137, 141; 119 S Ct 1167; 143 L Ed 2d 238 (1999). The party offering the expert testimony bears the burden of satisfying the preconditions of MRE 702 and establishing admissibility of the proposed evidence. *Gilbert*, 470 Mich at 781, 789.

Defendant was charged in this case with OWI under MCL 257.625(1)(a), which provides as follows:

> (1) A person, whether licensed or not, shall not operate a vehicle on a highway or other place open to the general public or generally accessible to motor vehicles, including an area designated for the parking of vehicles, within this state if the person is operating while intoxicated. As used in this section, "operating while intoxicated" means any of the following:

> (a) The person is *under the influence of* alcoholic liquor, *a controlled substance, or other intoxicating substance* or a combination of alcoholic liquor, a controlled substance, or other intoxicating substance. [Emphasis added.]

To prove a person was "under the influence" of alcoholic liquor, a controlled substance, or other intoxicating substance, the prosecution "must prove that defendant's ability to drive was substantially and materially affected by consumption" of the relevant substance. *People v Lambert*, 395 Mich 296, 305; 235 NW2d 338 (1975) (quotation marks omitted); see also *People v Dupre*, 335 Mich App 126, 131-132; 966 NW2d 200 (2020).

Here, defendant argues that the prosecution "has yet to point to a study that correlates the opinion of a DRE evaluator to actual degradation of a subjects' ability to safely operate a motor vehicle." Defendant and amicus contend that the DRE protocol has not been validated as a reliable tool for determining whether a person's ability to drive has been impaired by marijuana and that

Schaller's opinion is thus inadmissible under MRE 702 because it is based on unreliable principles and methodologies. Defendant argues that the studies on which the prosecution relied only validated the DRE protocol's accuracy in determining the presence of a substance in a subject's blood but did not validate the DRE protocol for determining a subject's degree of impairment. We agree.

It is apparent from the record that the prosecution did not present any evidence in the district court to show that the DRE protocol had been validated as a reliable method for demonstrating a person's *level of impairment* due to marijuana or the *degree to which a person's driving abilities could be diminished* by any given level of marijuana. The studies relied on by the prosecution demonstrated the DRE protocol's level of accuracy with respect to determining whether a particular type of substance was *present* in a person's blood, but neither of the submitted reports purported to even address the question of how particular levels of marijuana impacted a person's ability to drive or rendered a person "impaired." Indeed, the determination under the DRE protocol that a person is "impaired" and unable to safely drive a car appears to be ultimately based on the DRE officer's subjective judgment, and there is no evidence in this record that the ability of a person to make such a judgment based on the application of the DRE protocol has been tested to demonstrate the accuracy and validity of reaching such a conclusion on a person's level of impairment due to marijuana.

Additionally, in the 2017 report to Congress, the NHTSA wrote that, although research has shown that marijuana has the potential to impair one's ability to drive, there were "currently no evidence-based methods to detect marijuana-impaired driving." This report also stated that the available research did not yet support the development of a practical and feasible "psychomotor, behavioral or cognitive test that would indicate the degree of driving impairment and elevated risk of crash involvement due to marijuana use."

It bears repeating that the earlier field study—on which the prosecution relies—contained the following disclaimer:

> This section discusses the accuracy of the DREs decisions regarding which specific drugs the suspects were under the influence of. It is important to remember that the DREs in this study were examining the suspects for law enforcement purposes. The DREs indicated whether they felt the suspects were "impaired" by drugs (and hence "unable to operate a motor vehicle safely"), and if so, what specific drugs (or drug classes) the suspect was "impaired" by.

> There is no way to determine objectively whether the suspects were actually too "impaired" to drive safely. The fact that drugs were found in a suspect's blood does not necessarily mean the suspect was too impaired to drive safely. Contrary to the case with alcohol, we do not know what quantity of a drug in blood implies impairment. Thus, this study can only determine whether a drug was present or absent from a suspect's blood when the DRE said the suspect was impaired by that drug.

The prosecution did not present any evidence that the DRE protocol has been tested, or has a known error rate, *with respect to the purpose for which the prosecution intended to use the results*

*of the protocol in this case—to provide evidence of defendant's level of impairment and impaired driving ability*. *Muhammad*, 326 Mich App at 52. There simply is no evidence in this record to support that the DRE protocol can reliably be used to detect the degree or level of intoxication caused by marijuana and determine whether that level of intoxication has made the person unable to safely drive a motor vehicle. Our Supreme Court has explained that because "MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data," it is therefore "insufficient for the proponent of expert opinion merely to show that the opinion rests on data viewed as legitimate in the context of a particular area of expertise . . . ." *Gilbert*, 470 Mich at 782. "The proponent must also show that any opinion based on those data expresses conclusions reached through reliable principles and methodology." *Id*. Moreover, the court's "gatekeeping inquiry must be tied to the facts of a particular case," *Kumho Tire*, 526 US at 150 (quotation marks and citation omitted), and there must be " 'a valid . . . connection to the pertinent inquiry as a precondition to admissibility,' " *id*. at 149, quoting *Daubert*, 509 US at 592 (ellipsis in original). Here, the prosecution has failed to establish any valid connection between the use of the DRE protocol and a conclusion regarding the degree to which a person's driving ability was diminished by the use of marijuana.

It is clear from the very evidence which they presented to the district and circuit courts that the prosecution failed to meet its burden to establish the reliability, and thus the admissibility, of the proposed expert testimony. *Gilbert*, 470 Mich at 779-781, 789; *Muhammad*, 326 Mich App at 52. Therefore, the proposed expert testimony was inadmissible under MRE 702.[6]

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Stephen L. Borrello
/s/ Michael J. Kelly

---

[6] We note that this conclusion does not preclude the prosecution from introducing Schaller's testimony as a lay witness to the extent that testimony is otherwise not inadmissible. Contrary to the apparent concern of our dissenting colleague, our holding is not a blanket prohibition on Schaller's testimony. We simply hold that Schaller cannot provide expert testimony under MRE 702 regarding his application of the DRE protocol and the opinion he formed of defendant's state of impairment due to marijuana.